IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

GREGORY LINSTON GILLILAN, :
:
      Plaintiff, :
:
  VS. : Civil Action File No.
: **1:07-CV-27 (WLS)**
ROGER WALTON, et.al, :
:
      Defendants. :

## **RECOMMENDATION**

Currently pending in this *pro se* prisoner 42 U.S.C. § 1983 action is defendants' motion for summary judgment (doc. 21). In his complaint, plaintiff alleges that defendants, mental health providers at Autry State Prison, violated his constitutional rights by discontinuing his medication and not ensuring he received necessary treatment while at Autry State Prison ("Autry"). Defendants move for summary judgment both on the merits of the case and for plaintiff's failure to exhaust administrative remedies. It should be noted that this plaintiff is a frequent filer, having filed some 52 lawsuits in this district alone.

*Deliberate Indifference*

Plaintiff claims that while he was housed at Autry, Dr. Drury discontinued his Wellbutrin, Benadryl and Risperdal. Plaintiff claims he did not see a mental health physician and that his lack of medication caused him to attempt suicide on January 29, 2007. (Doc. No. 2, Complaint). After the alleged suicide attempt, plaintiff claims that defendant Walton refused to transfer him to the Crisis Stabilization Unit ("CSU").

At all times relevant to plaintiff's complaint, defendants worked in the mental health department of Autry. (Exhibit A, Walton Aff. at ¶ 1); (Exhibit B, Drury Aff. at ¶ 1); (Exhibit C, Johnson Aff. at

¶ 1); (Exhibit D, Harrison Aff. at ¶ 1). Mr. Walton is a mental health counselor, Dr. Harrison is a psychologist and Drs. Drury and Johnson are psychiatrists. Id.

Plaintiff was transferred to Autry from another state prison on December 12, 2006. (Exhibit A at ¶ 3). At that time, his primary diagnosis was Narcissistic Personality Disorder with anti-social traits. Plaintiff was classified mental health Level III and placed in special housing. Id. Plaintiff's medications from his prior prison included Risperdal, Phenobarbital, Neurontin, Benadryl, Vitamin B6 and INH. (Exhibit B at ¶ 2). Plaintiff had been on Risperdal since October 19, 2006. (Id. at ¶ 5). On November 6, 2006, a psychiatrist at plaintiff's former prison increased the Risperdal dose to 3 mg. per day. Id.

The medical records do not show that plaintiff was prescribed Wellbutrin prior to his arrival at Autry. In his reply brief, plaintiff states that a doctor at Calhoun State Prison, where he was apparently housed prior to his transfer to Autry, discontinued his Wellbutrin. (Doc. 24 ). Plaintiff also admits that he pretended to take Risperdal at Augusta State Medical Prison because he does not like the side effects.

On the day of plaintiff's arrival at Autry, a physician's assistant prescribed Risperdal, Phenobarbital, Neurontin, Benadryl, Vitamin B6 and INH. (Id. at ¶ 4). The standard procedure for newly arriving inmates is to have a senior level provider continue the medications they are on until they are evaluated by a physician. Id. Accordingly, on December 27, 2006, plaintiff was examined by a psychologist. (Id. at ¶ 6). Plaintiff told Dr. Wilkes that he was on Risperdal but that he was not always compliant with taking the medication. Plaintiff also stated that he took Phenobarbital for seizures and Neurontin for pain. As plaintiff appeared to require evaluation by a psychiatrist, he was referred accordingly. Id.

Thus, plaintiff was scheduled to meet with Dr. Drury for an intake examination on January 8, 2007. (Id. at ¶ 7). However, plaintiff refused to be seen. Id. Dr. Drury noted that plaintiff had apparently filed a lawsuit against multiple individuals, including Dr. Drury, despite the fact he had never even met with the patient. Id. The plan was to have plaintiff return to the clinic as soon as possible and, if necessary, to be escorted by the certified emergency response team to ensure that plaintiff kept the appointment. Id.

At approximately 4:00 a.m. on January 29, 2007, plaintiff was seen by a nurse in the medical department after making superficial scratches to his left arm and left chest, which were cleaned with soap and water. When the nurse asked plaintiff why he cut himself, he said because he did not have anyone in the cell with him to cut. (Exhibit A at ¶ 6). Later that same day, counselor Walton met with plaintiff. (Id. at ¶ 7). At that time, plaintiff was housed in isolation/segregation ("Iso/Seg") after being charged with exhibition. When first placed in Iso/Seg, plaintiff was not given his property so he scratched himself in protest and was placed in temporary property restriction status. Id. Throughout counselor Walton's interview with plaintiff, plaintiff spoke of lawsuits. Id.

Plaintiff told counselor Walton: "In order to collect money on a mental health law suit one must show physical damage so I cut myself." Id. During the encounter, plaintiff ordered counselor Walton to put him in the Acute Care Unit ("ACU") or CSU, where he would have access to female staff. Id. Counselor Walton explained to plaintiff that he did not have the authority to transfer him, and that only a psychiatrist can transfer a patient into the ACU or CSU. Id. At that time, counselor Walton saw no evidence of bleeding or any reason to contact the psychiatrist. Id. Instead, he notified the security officers and medical staff that plaintiff was threatening to cut again and that the plan was to monitor plaintiff weekly as long as he remained in Iso/Seg for any contraindications to lock-down

3

and the need for further services. Id.

Dr. Drury met with plaintiff on February 9, 2007. (Exhibit B). Earlier appointments had been scheduled; however plaintiff was a no-show for one appointment, walked out of another appointment and was in lock down at another time. Id. Dr. Drury noted that plaintiff was very talkative and easily agitated. Plaintiff exhibited mood swings and his affect was angry. Id. Plaintiff was walking back and forth to retrieve various documents, lawsuits, etc. He seemed to be trying to intimidate Dr. Drury into giving him Benadryl and Wellbutrin. Id.

Although plaintiff wanted to be prescribed Wellbutrin, in Dr. Drury's professional opinion, Wellbutrin was not indicated for plaintiff's condition. (Id. at ¶ 20). Antidepressants are known to worsen bipolar symptoms. Id. Further, Wellbutrin is contraindicated in patients with seizure disorder, and plaintiff had a history of seizures. Id. Finally, Wellbutrin is frequently abused in the prison population and should be used with caution. Id. Instead of Wellbutrin, Dr. Drury believed that plaintiff would benefit from taking Geodon, but plaintiff refused. (Id. at ¶¶ 8, 10).

At the time of the February 9, 2007 session, plaintiff posed no danger to himself or others and there was no indication for forced medication. (Id. at ¶ 8). Dr. Drury instructed the counselor to watch plaintiff closely. Plaintiff's mental health classification remained Level III. Id. Dr. Drury met with plaintiff numerous other times in February 2007. (Exhibit B at ¶¶ 9, 10, 13, 17). Dr. Drury continued to urge plaintiff to try the medication Geodon, but plaintiff refused. (Id. at ¶ 10).

Then, on February 16, 2007, plaintiff agreed to take the Geodon, and Dr. Drury wrote the order. Geodon is an FDA approved mood stabilizer and antipsychotic. (Id. at ¶ 12). Dr. Drury ordered that the Geodon be given "crush and float" so that plaintiff would not be able to "cheek" the medication or hoard it. Id. The medication quickly helped stabilize plaintiff, decreasing his agitation and aiding

his sleep. (Id. at ¶ 14). On February 23, 2007, Dr. Drury increased the Geodon to 80 mg. (Id. at ¶ 17).

According to the records submitted by defendants, plaintiff was never assigned to Dr. Harrison's caseload. (Exhibit D at ¶ 5). As a psychologist, she is assigned to those mental health patients who are not prescribed psychotropic medication. Id. Dr. Harrison did not make any decisions regarding plaintiff's medications or housing. (Id. at ¶¶ 5, 6).

Dr. Johnson never provided any mental health treatment to plaintiff nor did she make any entries in his chart. (Exhibit C at ¶ 3). The only reference to Dr. Johnson was made by Dr. Palmer on March 22, 2007. On that date, Dr. Palmer was covering for Dr. Drury seeing patients. Dr. Palmer noted that plaintiff inmate claimed to have papers from a court that prohibited Dr. Drury from treating him and allowing Drs. Johnson and Harrison to treat him. Id. Dr. Palmer noted that the papers needed to be checked for origin and authenticity. Id. Dr. Palmer noted that he consulted with Dr. Johnson, who was unaware of the matter. Dr. Palmer referred the matter to Administration. Id. Since no such court order existed, there was no reason for Dr. Johnson to become involved in plaintiff's care and treatment.

The sole documentation plaintiff provides shows only that Geodon was discontinued on April 10, 2007, after, not before, plaintiff's transfer from Autry, per the patient's request. (Doc. No. 24-2 at p. 4).

In determining a summary judgment motion, the inferences drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235 (11th Cir. 1992)(citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). However, once the movant demonstrates the absence of a genuine issue of material fact,

the nonmovant must "make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

When the nonmoving party has the burden of proof at trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the nonmoving party's claim, or by pointing to specific portions of the record which demonstrate that the nonmoving party cannot meet its burden of proof at trial. <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 606-608 (11th Cir. 1991).

The existence of material disputed facts will not defeat summary judgment in favor of a public official, however, when the plaintiff "fails to make a showing sufficient to establish the existence of an element essential to [plaintiff's] case, and on which [plaintiff] will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex</u>, 477 U.S. at 322-23, 106 S.Ct. at 2552. Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

It is well established that prison personnel may not subject inmates to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976). However, "[m]ere incidents of negligence or malpractice do not rise to the level of constitutional violations." It must involve the "unnecessary and wanton infliction of

6

pain contrary to contemporary standards of decency." <u>Helling v. McKinney</u>, 509 U.S. 25 (1993). Knowledge of the medical need alleged or circumstances clearly indicating the existence of such need is essential to a finding of deliberate indifference. <u>Hill v. Dekalb Regional Youth Detention Center</u>, 40 F.3d 1176, 1191 (11th Cir. 1994), quoting <u>Horn ex rel. Parks v. Madison Co. Fiscal Court</u>, 22 F.3d 653, 660 (6th Cir. 1994), cert. denied, 513 U.S. 873 (1994). In the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscience of mankind." In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment. "It is......true that when a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." <u>McElligott v. Foley</u>, 182 F.3d 1248, 1256-1257 (11th Cir. 1999).

A medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11th Cir.1994) (quotation marks and citation omitted).

The record in this case is replete with continuing medical and psychiatric treatment for plaintiff's condition. Just because a plaintiff disagrees with the medical decision does not evidence deliberate indifference to his serious medical needs. This case presents a classic example of a plaintiff's disagreement with the medical judgment used in plaintiff's treatment, sounding in medical malpractice. To demonstrate "significant" harm, a plaintiff must provide verifying medical evidence that proves that it was the denial or delay in medical treatment that caused the harm rather

7

than an underlying condition or injury. Hill, 40 F.3d at 1186; Harris, 21 F.3d at 393-94 (11th Cir.1994). Nothing plaintiff has provided the court, nor anything revealed by a review of the record, rebuts defendants' properly supported motion for summary judgment.

*Failure to Exhaust*

Defendants also assert that plaintiff failed to exhaust administrative remedies. Section 1997e(a) of the PLRA mandates that "no action shall be brought" by a prisoner under any federal law until the prisoner has exhausted all "administrative remedies as are available," as follows:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.

Alexander v. Hawk, 159 F.3d 1321, 1324 (11th Cir. 1998).

"That provision plainly requires that administrative remedies be exhausted *before* the filing of suit, rather than while the action is pending." Wendell v. Asher, 162 F.3d 887, 890 (5th Cir. 1998) (emphasis in original). According to records maintained at the prison, plaintiff has failed to exhaust the administrative remedies available to him. Plaintiff maintains that to make any additional effort to exhaust administrative remedies would have been futile. Plaintiff has not satisfied the exhaustion requirement of § 42 U.S.C. 1997(e). The clear mandate of Alexander v. Hawk is that a prisoner must exhaust the remedies available under an administrative remedy program before filing an action such as this.

It is undisputed that the PLRA exhaustion requirement applies to all federal claims brought by an incarcerated person. Logue v. Chatham County Detention Center, 152 Fed.Appx. 781, 783 (11th Cir. 2005), citing Porter v. Nussle, 534 U.S. 516, 520 (2002). The "exhaustion requirement is

mandatory, and cannot be waived, even when the process is futile or inadequate." Logue, citing Alexander v. Hawk, 159 F.3d 1321, 1325-26 (11th Cir. 1998).

Therefore, it is the RECOMMENDATION of the undersigned that defendants' motion for summary judgment be **GRANTED**. Pursuant to 28 U.S.C. § 636(b)(1), the parties may file written objections to this recommendation with the Honorable W. Louis Sands, United States District Judge, WITHIN TEN (10) DAYS of receipt thereof.

**SO RECOMMENDED**, this 30th day of January, 2008.

                                       //S Richard L. Hodge
                                       RICHARD L. HODGE
                                       UNITED STATES MAGISTRATE JUDGE

msd